# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TYREE DARNELL TOMLINSON, JR.,    )
    )
        Plaintiff,    )
    )
    v.    )    C.A. No. 18-859 (MN)
    )
ANDREW M. SAUL, Commissioner of    )
Social Security Administration,    )
    )
        Defendant.[1]    )

## <u>MEMORANDUM OPINION</u>

Angela Pinto Ross, DOROSHOW, PASQUALE, KRAWITZ & BHAYA, Wilmington, DE – attorneys for Plaintiff

Eric P. Kressman, Regional Chief Counsel, Heather Benderson, Special Assistant United States Attorney SOCIAL SECURITY ADMINISTRATION, Office of the General Counsel, Philadelphia, PA – attorneys for Defendant.

September 25, 2019
Wilmington, Delaware

---

[1]    Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted for Nancy A. Berryhill, Acting Commissioner of Social Security who was named as the defendant in this suit.

**NOREIKA, U.S. DISTRICT JUDGE:**

## I.     INTRODUCTION

Plaintiff Tyree Darnell Tomlinson, Jr. ("Mr. Tomlinson" or "Plaintiff") appeals the decision of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner" or "Defendant"), denying his claim for Social Security Disability Insurance benefits under Title XVI of the Social Security Act.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are Plaintiff's motion and Defendant's cross-motion for summary judgment.  (D.I. 13, 15).  Plaintiff seeks remand with instructions to "immediately award benefits as of the alleged onset date, or in the alternative, remand . . . [to] issue a new decision based on substantial evidence and proper legal standards."  (D.I. 14 at 20).  The Commissioner requests that the Court affirm the decision denying Plaintiff's claim for benefits.  (D.I. 16 at 20).  For the reasons stated below, the Court will grant-in-part and deny-in-part Plaintiff's motion and deny Defendant's cross-motion for summary judgment.

## II.     BACKGROUND

### A.     Procedural History

On April 28, 2014, Plaintiff filed an application for Disability Insurance Benefits under Title XVI, alleging disability beginning September 22, 2013.  (Tr. 155).[2]  Plaintiff's claim was denied initially on June 9, 2014 and again upon reconsideration on October 1, 2014. (Tr. 84-88, 94-98).  Plaintiff then requested a hearing before the Administrative Law Judge ("ALJ") on November 26, 2014.  (Tr. 100-102).  The hearing took place on February 10, 2017 during which both Plaintiff and Theresa Wolford ("Ms. Wolford"), an impartial vocational expert ("VE"),

---

[2]     References to "Tr." are to the "Transcript of Social Security Proceedings" filed on September 27, 2018.  (D.I. 9).

testified. (Tr. 30-52). After the hearing, on April 17, 2017, the ALJ issued a decision finding that Plaintiff "is not disabled under section 1614(a)(3)(A) of the Social Security Act." (Tr. 24). Plaintiff requested review of the ALJ decision by the Appeals Council on June 14, 2017. (Tr. 152-53). On April 6, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On June 7, 2018, Plaintiff filed suit in the District of Delaware seeking judicial review of the Commissioner's denial of benefits. (D.I. 2). The parties completed briefing on the cross motions for summary judgment on January 18, 2019. (D.I. 13-17).

## B. Factual History

Plaintiff applied for supplemental security income on April 28, 2014 when he was 18 years old. (Tr. 22, 155). Plaintiff asserts that he became disabled as of September 22, 2013 prior to age 22, which is defined as a "younger individual" pursuant to 20 C.F.R. §416.963(c). (Tr. 22, 155). Plaintiff had completed 11th grade at Howard High School of Technology. (Tr. 187). According to his Work Background forms (Tr. 234, 247, 250), Plaintiff had worked only part-time for brief periods of time in 2015 and 2016.[3]

### 1. Disability Report – August 6, 2014 (Form SSA-3368)

In his Disability Report dated August 6, 2014 (Form SSA-3368) (Tr. 185-194), Plaintiff asserted that he has the following physical or mental conditions that limit his ability to work: brain damage, processing and cognitive, short term memory loss, depression, and PTSD (Tr. 186).

In his disability report, Plaintiff indicates that he never worked. (Tr. 186). He also lists the following medications: Clonapin (sleep), Imitrex (head pain), a muscle relaxer (pain), Ritalin

---

[3] In his decision, the AJL determined that Plaintiff "had no work activity representing substantial gainful activity after the application date of April 28, 2014." (Tr. 17).

(brain damage), all of which were prescribed by A.I. duPont Hospital for Children ("A.I."), and Flonase (allergies), loratadine (allergy), and prevental (asthma), which were prescribed by Jennifer Grilli D.O. of Christiana Care Family Medicine. (Tr. 188). Plaintiff lists Dr. Grilli, Christiana Hospital, and Dr. Haas of A.I. as providers who may have medical records about his physical and mental conditions. (Tr. 189-191).

### 2. Disability Report – Appeal – August 5, 2014 (Form SSA-3441)

In his Appeal Disability Report (Tr. 195-198), Plaintiff indicates that there have been no new illnesses, injuries, or conditions (and no changes) and that there are no new physical or mental limitations because of his illnesses, injuries, or conditions. (Tr. 195). Plaintiff indicates that he has not seen a doctor, hospital, or clinic for emotional or mental problems. (Tr. 196). His providers are Dr. Grilli and Dr. Haas and his medications are Flexeril and Ritalin. (Tr. 196-97).

### 3. Medical History, Treatment, and Conditions

The Court has reviewed all medical records submitted. The relevant medical history begins in September 2013 and continues through November 2, 2016. (D.I. 9-7 – 9-25, Exs. 1F – 15F).

### a. Christiana Care – Emergency Department

Plaintiff has records from the Emergency Department of Christiana Hospital on five occasions: May 2, 2013 (upper lip wound infection (Tr. 286-92, 1060-67, 1208-12)), August 16, 2013 (acute hyperventilation (Tr. 273-85, 1049-59, 1193-1207)), September 22, 2013 (motor vehicle accident (Tr. 262-272, 1037-48, 1173-92)), September 1, 2015 (abdominal and jaw pain (Tr. 1028-36, 1117-72)), and January 10, 2016 (chest wall pain (Tr. 1023-27, 1062-1116)).

Plaintiff arrived at the Emergency Department via ambulance on September 22, 2013 following his motor vehicle accident. Plaintiff's chief complaints at the time were abdominal pain and right knee pain. (Tr. 263). He denied loss of consciousness. (Tr. 264). Plaintiff was discharged with a diagnosis of "chest wall pain; MVC (motor vehicle collision)." (Tr. 265).

Plaintiff's "symptoms were evaluated with physical exam, medical interview, and xrays of [Plaintiff's] chest and knee – which were both normal without signs of fracture or traumatic injury." (Tr. 265).

### b.    Rochelle Haas, MD

The transcript indicates that Plaintiff's mother took him to A.I. DuPont Hospital for Children ("A.I.") following the visit to Christiana Hospital after the motor vehicle accident. (*See, e.g.*, Tr. 666, 1245). While there do not appear to be any A.I. Emergency Department records in the transcript dated September 22, 2013 (the date of the accident), the Court notes that there are several x-ray reports on Plaintiff's chest, elbow and breastbone and an ECG report from A.I. dated September 22, 2013. (Tr. 819-23, 826).

As noted above, Dr. Haas is a doctor at A.I who examined Plaintiff after his motor vehicle accident. Plaintiff was diagnosed with a concussion and reported pain in his knee, arm, and neck after the accident. (Tr. 921, 922). Plaintiff had thirteen office visits with Dr. Haas between October 18, 2013 and October 6, 2015. (Tr. 916-1018). Most, if not all, of these appointments were for concussion follow-up after the accident. At Plaintiff's initial visit with Dr. Haas, the records indicate that Plaintiff is "struggling. Mood, balance, thinking and opticokinetic exam all affected." (Tr. 925). During subsequent visits, the records indicate: "Improving in symptom report and function" (Tr. 936); "Concussion Screen: normal"; "anxiety and depression complicating concussion recovery, likely responsible for increase in symptoms as well" (Tr. 944); "significant auditory processing concerns"; "mood is a big issue" (Tr. 952); "concussion screen: further testing recommended with neuropsychology" (Tr. 961); "started Ritalin. Mind seems clearer. Not taking it consistently on a daily basis as prescribed"; "appears less fatigued, improved mood" (Tr. 977-978); "feels better overall – facing the fact of his injury" (Tr. 985); "continues to

make slow progress.  Mood still a factor in slowed recovery" (Tr. 987); "continues to make improvements.  Transition information provided" (Tr. 996).

In a January 2014 letter, Dr. Haas and Jennette Firlein, a nurse practitioner, noted that Plaintiff suffered a concussion with various symptoms.  (Tr. 839).  They recommended school accommodations including a 504 plan, only attending school half a day, and receiving homebound instruction for any missed work.  (Tr. 839).  They also recommended 15-20 minute breaks, reduction in work load and limitations on tests.  (Tr. 840-41).

At Plaintiff's July 24, 2014 appointment, Dr. Haas notes that Plaintiff is "leaving July 29th to move to Georgia" (Tr. 994).

The below table summarizes Plaintiff's additional diagnostic studies performed at A.I.:

| DATE | STUDY | RESULT |
|---|---|---|
| 9/26/2013 (Tr. 817-18) | XR ABDOMEN OBSTRUCTION SERIES | 1. Normal bowel gas pattern. <br> 2 . Benign-appearing lucency in the right femoral neck, nontraumatic, recommend further views |

| DATE | STUDY | RESULT |
|---|---|---|
| 10/2852013 (Tr. 814-16) | NUC MED BONE SCAN, 3 PHASE, NUC MED BONE IMAGING (3D-SPECTROSCOPY) | 1 . Focal increased activity at the right lateral tibial condyle at all 3 phases of bone scan as described above. Differential diagnoses include occult fracture, stress fracture. Somewhat focal activity at the anterolateral tibial plateau reason to question of meniscal injury.<br><br>2. Focal increased activity at the right supero-lateral aspect of the manubrium sternum inferolateral to the articular surface, which could represent an occult fracture.<br><br>3. Physeal activity of the right proximal humerus is relatively increased compared to the left on the SPECT, which may be due to reactive hyperemia, however chronic injury can't be excluded. |
| 10/25/2013 (Tr. 809-10) | MRI SHOULDER W/O CONTRAST | 1. Small area of bone marrow edema involving the proximal posterior metaphysis which could be a stress-related injury.<br><br>2. Heterogeneous signal of the posterior inferior labrum, a tear is not excluded. MR arthrogram is recommended for further evaluation. |
| 10/25/2013 (Tr. 807-08) | MRI KNEE W/O CONTRAST | 1. Nonspecific slight bone marrow edema present at the anterolateral aspect of proximal tibia.<br><br>2 . Mild soft tissue edema along the lateral posterior aspect of the distal quadriceps tendon and proximal patellar tendon as discussed above .<br><br>3. Mild focal irregularity present a long the cartilage in lateral aspect of the proximal tibia. |
| 11/7/2013 (Tr. 805-06) | MRI BRAIN W/O CONTRAST INC STEM | Normal non-contrast brain MRI |

| DATE | STUDY | RESULT |
|------|-------|--------|
| 12/20/2013 (Tr. 802-04)[4] | MRI TEMPOROMANDIBULAR JOINTS | No apparent internal derangement of the temporomandibular joints, particularly on the left. |
| 1/6/2014 (Tr. 800-01) | XR LOWER EXT BILATERAL 1 VW | Genu valgum |
| 6/30/2014 (Tr. 876-84) | SLEEP STUDY (Dr. Raj Padman) | Sleep Medicine Diagnosis:  Sleep Related Breathing Disorders<br><br>Impression: Snoring, elevated REM apnea hypopnea index, elevated end tidal co2 readings, increased arousals<br><br>Need to evaluate upper air way integrity<br><br>Refer to ENT service |

On July 2, 2015, Plaintiff again saw Dr. Haas.  The records indicate that once Plaintiff moved to Georgia, he "didn't have a way to get medicines.  Struggled."  (Tr. 1003).  "In Georgia saw 1 doctor – one visit" "never saw a pcp."[5]  (Tr. 1003).  The last visit with Dr. Haas memorialized in the records is October 6, 2015.  During this visit, Dr. Haas notes that Plaintiff is living back in Delaware, "mood – up and down.  Not in any counseling – was supposed to work with a psychiatrist."  (Tr. 1012).  "Mood and anxieties largely contributing to symptom report at this time."  (Tr. 1013).

---

[4]     This study was completed at MRI + CT Silverside and manually entered into A.I.'s computer system.  (Tr. 802).

[5]     The transcript contains an Emergency Department visit on November 2, 2016 to WS Paulding Hospital in Georgia (Tr. 1250-1262) for abdominal pain and nausea.  There are no other records for providers in Georgia.

### c. Jennifer Grilli, DO

The transcript includes records for three visits with Dr. Grilli: April 16, 2014 – blood pressure and sinus issues (Tr. 827-30, 12-13-16); June 6, 2014 – left knee pain, inner thigh, right hand (Tr. 1217-23); and January 14, 2016 – follow-up from hospital, chest pain (Tr. 1224-27).

### d. Erica Sood, PhD

According to the records, Plaintiff attended three psychological therapy appointments with Dr. Erica Sood: February 11, 2014 (Tr. 310-12), March 7, 2014 (Tr. 411-13), and March 14, 2014 (Tr. 445-47). The diagnoses for these appointments are posttraumatic stress disorder and depressive disorder. At this last appointment, Plaintiff was again "encouraged to consider initiating an anti-depressant to help stabilize mood." (Tr. 446).

### e. Physical, Speech and Occupational Therapy

Between February 21, 2014 and April 11, 2014, Plaintiff participated in seven physical therapy sessions. The diagnosis for all of these appointments is "concussion" and "right shoulder pain." (Tr. 316, 338, 379, 484, 552, 638, 687).

In 2014, Plaintiff also attended 16 speech therapy sessions: seven in March 2014 (Tr. 352, 366, 417, 451, 465, 519, 533), five in April 2014 (Tr. 626, 675, 701, 713, 725), and four in May 2014 (Tr. 740, 752-53, 766, 778). In speech therapy, Plaintiff reported constant headaches. (Tr. 352). He was distracted, cried, demonstrated difficulty with attention and self-monitoring, and appeared restless, reporting constant internal distractions. (Tr. 351, 352). He frequently jumped from topic to topic and repeated himself. (Tr. 352, 366). At the end of the day's session, he often could not remember three topics discussed during that day's therapy. (Tr. 352, 360). He needed multiple redirections to maintain attention. (Tr. 360). When reading aloud he made frequent errors and had difficulty sounding out vocabulary. (Tr. 360). Plaintiff struggled to

organize information that he read, and he took three times as long as an average student his age to complete testing related to organizing information. (Tr. 417).

During his sessions, Plaintiff indicated his pain worsened by the end of each session. (Tr. 626, 713, 719, 731, 739). He had difficulty with cognitive endurance, information processing especially requiring repetition and prompts to answer the question appropriately, attention and memory. (Tr. 675, 682, 713, 720, 725, 732, 740, 766, 773, 785, 845). His attention span was no more than ten minutes before he needed a break due to fatigue and headaches. (Tr. 713, 720). Plaintiff had difficulty completing tasks independently. (Tr. 772, 851). S-FAVRES testing in May 2014 showed a range of average to far below average responses and demonstrated significant difficulty following instructions. (Tr. 752).

The transcript also contains records for five occupational therapy visits. (Tr. 397, 432, 502, 570, 652-53).[6] During those visits, Plaintiff consistently referenced problems with retaining information.

### f.      Karen Kelly, PhD

Karen Kelly, a licensed psychologist performed a Neuropsychological Evaluation on Plaintiff on April 8, 2014. (Tr. 665-71). Plaintiff "demonstrated significant variability within the evaluation." (Tr. 667). While he performed in the average range on certain tests, he "performed in the impaired range, typically between two and three standard deviations below average, on executive functioning tasks of complex recall/memory and attentional processing skills. His performance was representative of full impairment and, even using broad average functioning as a pre-injury estimate, fell qualitatively and quantitatively well below expectancy. Attentional

---

[6]      The notes from these visits suggest that Plaintiff had at least 11 occupational therapy sessions. (Tr. 652).

switching, another measure of executive processing, was also fully impaired." (Tr. 667-68). Dr. Kelly noted that Plaintiff "performed well below expectation, between one and two standard deviations below expectancy, on tasks of neuromotor speed and dexterity" and that tasks of verbal memory, complex visual memory and recall, associative memory of visual-verbal were impacted. Overall, she noted that Plaintiff "remains highly symptomatic, particularly with exertion of cognitive effort," and that he had "bona fide deficits in attentional processing skills, which impact his ability directly to process, learn, and/or memorize information" and which appeared to come from his injury. (Tr. 668). Dr. Kelly opined that his performance was representative of "full impairment and, even using broad average functioning as a pre-injury estimate, fell qualitatively and quantitatively well below expectancy." (Tr. 667-668).

### g.  Dr. Gregory Cooper – Focus Behavioral Health

According to the transcript, Plaintiff saw Dr. Cooper four times from 2015 to 2016: December 22, 2015 (Tr. 1243) and January 12 (Tr. 1235), March 8 (Tr. 1237), and April 6, 2016 (Tr. 1239). At Plaintiff's initial visit, Dr. Cooper diagnosed Plaintiff with "Major Neurocognitive Disorder due to Traumatic Brain Injury, with behavioral disturbance," "ADHD, Combined Presentation", and "Post Traumatic Stress Disorder." (Tr. 1243-44). He prescribed Lamictal and Prazosin. (Tr. 1244). At the next visit, Dr. Cooper replaced "Major Neurocognitive Disorder due to Traumatic Brain Injury, with behavioral disturbance" with "Dementia in other diseases classified elsewhere with behavioral disturbance" in his diagnosis. (Tr. 1235). Dr. Cooper notes several times: "Mr. Tomlinson reveals no serious mental status abnormalities. . . . Associations are intact, thinking is basically logical, and thought content is appropriate. There are no signs of cognitive difficulty, based on vocabulary and fund of knowledge. Memory is intact for recent and remote events and he is oriented to time and place. There are no signs of anxiety. A normal

attention span is in evidence and there are no signs of hyperactivity. Judgment and insight appear intact." (Tr. 1235, 37, 39). At Plaintiff's last visit with Dr. Cooper, Plaintiff states that "he is feeling better. Lows are much less. Irritability is improving, Nightmares continue but are not as frequent or as intense." (Tr. 1239).

### h.      Alan Fink, MD

Dr. Fink, a neurologist, examined Plaintiff in June 2016. He reported that he had reviewed records from multiple treating sources and had received a detailed explanation of the motor vehicle accident in September 2013. (Tr. 1245). Plaintiff informed the doctor about his difficulty paying attention, anger, lability, homeschooling and failing of 12th grade. (Tr. 1246). Dr. Fink noted that the neuropsychological exam from April 2014 showed deficits in attention and memory. At the time of Dr. Fink's examination, Plaintiff was taking Ritalin, Trazadone, Zanaflex and Aleve. (Tr. 1246). Dr. Fink indicated the headaches Plaintiff was having at least twice weekly were migraines secondary to post-concussive syndrome. Plaintiff reported difficulty sleeping associated with night terrors and episodes of depression and mood swings consistent with PTSD. Dr. Fink anticipated psychiatric care with medication would need to last at least two to three years. (Tr. 1248). He concluded that Plaintiff had not improved since his concussion, had difficulty with recent memory, was capable of self-care and had slight impairment in solving problems, similarity and differences. (Tr. 1248-1249).

### i.      State Agency Consultants

In June of 2014, state agency consultants Maurice Prout, Ph.D. and Darrin Campo, M.D., reviewed the evidence of record and determined that Plaintiff "appears to be capable of at least simple, repetitive tasks. Physically capable of at least light work." (Tr. 61). Dr. Campo opined that Plaintiff could occasionally lift and/or carry 25 pounds, frequently lift and/or carry 10 pounds,

stand and/or walk and sit (with normal breaks) each for about 6 hours in an 8-hour workday, and had unlimited capacity to push and/or pull. (Tr. 65). He opined that Plaintiff could frequently climb ramps/stairs, stoop, kneel, crouch, and crawl and that he could never climb ladders/ropes/scaffolds and could occasionally balance (Tr. 65), and limited Plaintiff to unskilled medium work (Tr. 68). Dr. Prout opined that Plaintiff does have understanding and memory limitations, sustained concentration and persistence limitations, and social interaction limitations with the highest limitation being "moderately." (Tr. 67-68).

In September 2014, Christopher King, Psy.D. stated that Plaintiff "appears to be making progress with regard to mental processing and mood since the initial application. Physically, he maintains a normal gait with no strength or tone deficits." (Tr. 76). Dr. King recommended "affirmation of Dr. Prout's simple routine MRFC . . . and Dr. Campo's light RFC. . . ." (Tr. 76). Jose Acuna agreed with Dr. Campo's assessment and added environmental limitations that Plaintiff should avoid concentrated exposure to extreme cold, heat, humidity, noise, vibration, fumes, odors, dusts, gases, machinery, and heights. (Tr. 80). He limited Plaintiff to unskilled, light work. (Tr. 81).

### j.     Other Medical Providers

During the relevant time, Plaintiff also was seen at A.I. Emergency Department for a "complicated migraine" (Tr. 592) that resolved with medication, by Oral and Maxillofacial Surgery Associates of Chester County (Tr. 293-98) and received other routine medical care. (Tr. 307-09). To the extent any of that care is relevant to the Court's analysis it will be discussed below.

### 4.    The Administrative Hearing

On February 10, 2017, the ALJ conducted an administrative hearing, at which both Plaintiff and VE, Ms. Wolford, testified.  (Tr. 31).

### a.    Plaintiff's Testimony

Plaintiff testified that he was in a motor vehicle accident on September 22, 2013, but that he could not remember anything about the accident.  (Tr. 34).  After the accident, life became "very stressful and very depressing."  (Tr. 34).  Plaintiff went through extensive therapy: occupational, physical, speech, comprehension, memory, and mental health.  (Tr. 35-36).  He was cleared to return to school about two months after the accident (Tr. 36) but had to leave school again after about three weeks because he "couldn't stand the atmosphere" of school (Tr. 36-37) – the lights gave him blinding headaches and he "couldn't stand the fact of being around other students" (Tr. 37).  Plaintiff testified that he tried to work several jobs after the accident but would quit after he became frustrated with himself.[7]  (Tr. 39).  Currently, Plaintiff is "trying to attend college" in Georgia but stated that it is "very, very difficult."  (Tr. 40-41).  He was not accepted for medical care in Georgia and, therefore, is not getting appropriate medical care.  (Tr. 41).

### b.    Vocational Expert's Testimony

Ms. Wolford testified as to the classification of Plaintiff's job of monitoring cameras in a parking lot as a sedentary job.  (Tr. 51).  The ALJ asked Ms. Wolford to consider a hypothetical person of the same age, with the same high school education, and with the same past work experience as Plaintiff and to assume that the individual could perform light work but could not

---

[7]    Plaintiff appears to become "frustrated" with himself for not being able to perform jobs "due to being very fatigued and – or, feeling pain in [his] head, or in [his] leg."  (Tr. 38).  He did not want his employers feeling like he was "milking" his injuries or "just saying certain things."  (Tr. 39).  He further testified that he "would end up at the hospital or an emergency room" so they would give him a note to give to his employers.  (Tr. 39).

climb ladders, ropes, or scaffolds or perform work at unprotected heights or around dangerous or moving machinery. (Tr. 51). When asked if there were any jobs that this hypothetical person could perform, Ms. Wolford identified a cleaner/housekeeper, a filing clerk, and an assembler/production. (D.I. 51-52). The ALJ then asked Ms. Wolford if the hypothetical person was not "able to complete a full eight-hour work day on a regular consistent basis, on any sustained basis" would there be any jobs this person could work. (Tr. 52). Ms. Wolford testified that there would be no jobs available. (Tr. 52). Plaintiff's attorney did not ask any questions of Ms. Wolford. (Tr. 52).

### c.      The ALJ's Findings

On April 17, 2017, the ALJ issued the following findings (Tr. 17-23):

1.     The claimant has not engaged in substantial gainful activity since April 28, 2014, the application date (20 CFR 416.971 *et seq.).*

2.     The claimant has the following severe impairment: status-post motor vehicle accident, with allegations of injuries to nervous system (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never climb ladders, ropes, or scaffolds and never perform any work at unprotected heights or around dangerous or moving machinery.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on January 7, 1996 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since April 28, 2014, the date the application was filed (20 CFR 416.920(g)).

## III.    LEGAL STANDARDS

### A.     Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S.

at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.      Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence that was not submitted to the ALJ can be considered, however, by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has made clear that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the Social Security Income ("SSI") program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Zirnsak v. Colvin*, 777 F.3d 607, 611-612 (3d Cir. 2014).  If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity); *Zirnsak*, 777 F.3d at 611.  If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe.  *Id.*  If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (20 C.F.R § 404.1520, Subpart P, Appendix 1) that are presumed severe enough to preclude any gainful work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Zirnsak*, 777 F.3d at 611. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant

is presumed disabled. *Id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Zirnsak*, 777 F.3d at 611. A claimant's RFC "is the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1); *Zirnsak*, 777 F.3d at 611 (quoting 20 C.F.R. § 404.1545(a)(1)). "[T]he claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work." *Zirnsak*, 777 F.3d at 611 (quoting *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of nondisability when claimant can adjust to other work). At this last step, ". . . the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing." *Zirnsak*, 777 F.3d at 612 (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). In other words, the Commissioner ". . . is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). In making this determination, "the Commissioner uses the RFC

assessment, . . . and the testimony of vocational experts and specialist." *Zirnsak*, 777 F.3d 612.

"'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.'" *Zirnsak*, 777 F.3d 612 (quoting *Provenzano v. Comm'r*, Civil No. 10-4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

## B. Issues Raised on Appeal

On appeal, Plaintiff raises three arguments in support of reversal for an award of benefits or remand: (1) the ALJ failed to consider evidence of impairment and did not incorporate all established limitations into the hypothetical question posed to the vocational expert, (2) the ALJ erred in failing to determine whether Plaintiff's traumatic brain injury met Section 12.02 of the listing of impairments, and (3) the ALJ erred in weighing the opinion evidence. (D.I. 14).

### 1. Evidence Regarding Impairment / Failure to Incorporate Limitations

Plaintiff argues the ALJ "ignored substantial evidence of the claimant's mental and cognitive impairments and failed to incorporate credibly established mental/cognitive limitations into the RFC." (D.I. 14 at 28). Specifically, Plaintiff argues that the ALJ improperly "cherry-picked evidence that was supportive of his finding that the claimant had no severe mental or cognitive impairment, while wholly ignoring significant evidence to the contrary." (D.I. 14 at 30). The Court agrees.

While the ALJ need not explicitly refer to every exhibit in the record, the ALJ "must consider all the evidence and give some reason for discounting the evidence [he] rejects." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (ALJ is not permitted to cherry pick evidence that supports his or her position but instead "must consider all the evidence and give some reason for discounting the evidence she rejects"); *see also, Lewis ex rel K.L. v. Colvin*, Civ. A. No. 12-6186, 2014 WL 3855329 at *6, n.11 (remand appropriate when the ALJ's analysis contained the "positive

notations" and amounted to "cherry picking" and "ignoring medical assessments that ran counter to her conclusions"). Here, the ALJ ignored substantial evidence that ran counter to his conclusions without any explanation. For example, he found that the Plaintiff was making progress in physical and occupational therapy citing to one exhibit (Tr. 20), but ignored the reference to other significant symptoms and functional limitations contained in that exhibit and others relating to his therapy sessions. (*E.g.,* Tr. 652-653 (referencing issues with concentration, memory and comprehension, the need to take breaks, sensitivity to light and noise, fatigue, fogginess and difficulty sleeping, along with concentration and memory issues)).

Similarly, although the ALJ stated in conclusory fashion that "diagnostic studies show no serious physical and mental impairment" (Tr. 20 (citing *inter alia* to Ex. 4F)), he failed to address or mention the neuropsychological evaluation by Dr. Kelly that indicated "bona fide deficits" and "full impairment" resulting from his injury. So too, the ALJ glossed over evidence with respect to Plaintiff's speech therapy, noting only "[t]he claimant also underwent speech therapy in 2014." The records of that therapy, however, indicate difficulty with attention and memory as well as information processing, noting that often Plaintiff required repetition and cueing to answer questions appropriately. (Tr. 675, 682, 713, 720, 725, 732, 740, 766, 773, 785, 845). While the ALJ may have considered all of this evidence, the conclusory statements made do not evidence such consideration or provide the Court with sufficient explanation to allow for meaningful review. Thus, the Court remands for further findings regarding Plaintiff's impairments based on all of the evidence in the record.[8]

_____

[8]     On remand, the Court expects that the ALJ will, as required, incorporate credibly established mental or cognitive limitations into the RFC assessment. *See* 20 C.F.R. § 416.945(e);

### 2.    Classification of Plaintiff's Traumatic Brain Injury

Plaintiff argues that the ALJ "failed to recognize that [Plaintiff] had significant neurocognitive limitations caused by the traumatic brain injury separate and apart from his psychiatric disorders." (D.I. 14 at 37).  Specifically, Plaintiff argues that the ALJ "failed to analyze whether the Plaintiff meets or equals Section 12.02 of the Listing of Impairments related to neurocognitive impairments." (D.I. 14 at 38).  Defendant counters that the ALJ did not need to evaluate Plaintiff's impairments under Listing 12.02 pertaining to neurocognitive disorders, because "the evidence did not support that Plaintiff had a traumatic brain injury." (D.I. 15 at 16).  Listing 12.02 refers to deficits caused by a traumatic brain injury, such as decline from a previous level of functioning in areas such as complex attention, executive functioning, learning and memory, language, perceptual motor or social cognition. *See* 20 C.F.R. Part 404, Appendix 1, 12.00B1b.

Initially, the Court notes that both the ALJ and Defendant assert that Plaintiff was not diagnosed with a concussion following the September 2013 accident. (Tr. 20; D.I. 16 at 16).  That, however, ignores that he was shortly thereafter treated for post-concussion symptoms by Dr. Haas.  Moreover, as noted above, the ALJ essentially ignored the neuropsychological evaluation performed by Dr. Kelly that established that Plaintiff suffered from numerous cognitive and neurological issues including abnormality in the way auditory information reached the auditory cortex and processing of auditory signals at level of primary cortex bilaterally, difficulty with naming, saying and pronouncing multi-syllable words; and struggle with attention. (Tr. 666-67).

There, thus, appears to be evidence in the record demonstrating that Plaintiff was diagnosed with a traumatic brain injury following his motor vehicle accident in 2013 and that he suffered declines in functioning from that accident that may fall under Listing 12.02.  The Court will thus

remand for the ALJ to determine whether, in light of all of the evidence of record, Plaintiff should be evaluated under Listing 12.02.

### 3. Weight of Medical Opinions of Treating Physician

Plaintiff asserts that the ALJ erred in three ways with respect to the medical opinion evidence – failing to give due weight to the opinions of treating physicians, Dr. Haas and Dr. Fink, and crediting state consultants. The ALJ is charged with the duty of evaluating medical opinions. *See* 20 C.F.R. § 404.1527. "[T]he ALJ is free to accept some medical evidence and reject other evidence, provided that he provides an explanation for discrediting the rejected evidence." *Zirnsak*, 777 F.3d at 614. It is not for the Court to re-weigh the medical opinions in the record. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008). Rather, the Court must determine whether substantial evidence exists to support the ALJ's weighing of those opinions. *See id.*

Generally, the opinions of a treating source will be given more weight. 20 C.F.R. § 404.1527(c)(2). To receive controlling weight, however, a treating physician's opinion must be ". . . well supported by medically acceptable clinical and laboratory diagnostic techniques . . ." and must not be ". . . inconsistent with the other substantial evidence . . ." in the record. *See id.* § 404.1527(c)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). Moreover, the ALJ is not required to accept treating source opinions uncritically and may decline to assign significant weight to such an opinion when assigning such weight would conflict with the record. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing 20 C.F.R. § 404.1527(c)(2)). Indeed, while "[a]n ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, [he] may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Id.* (citing *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985)).

As to Dr. Fink, the Court finds that the ALJ provided a sufficient explanation for discrediting his opinions. The ALJ explained that Dr. Fink "did not provide a specific function-by function assessment of the claimant's abilities," that "Dr. Fink's opinions are not consistent with the medical evidence" and that Dr. Fink's opinions were "prepared to promote a personal injury claim." (Tr. 21). Therefore, he afforded them little weight. The Court will not second guess that.

As to Dr. Haas, it is not at all clear that Dr. Haas' recommendations that Plaintiff receive school accommodations in the months after his September 2013 motor vehicle accident amount to an opinion concerning his work-related functional limitations. In any event, the Court has already remanded the case for the ALJ to review the evidence and make additional findings as to Plaintiff's limitations. To the extent that involves reviewing records of Dr. Haas' treatment of Plaintiff, the ALJ can determine what weight to give any opinions of Dr. Haas relevant to Plaintiff's work related functional limitations. Thus, the Court will remand for further findings as to the appropriate weight to give any relevant opinions of Dr. Haas.

Finally, as to the ALJ's decision to give "great weight to the assessments of the state agency consultants" (Tr. 64-66, 77-80), as with Dr. Haas, on remand the ALJ, after reviewing all of the record evidence, can determine whether the opinions of the state agency consultants are consistent with the evidence and what weight to afford them.

## V.    <u>CONCLUSION</u>

For the reasons stated, the Court will grant-in-part and deny-in-part Plaintiff's motion and deny Defendant's cross-motion for summary judgment. This matter will be remanded for further proceedings consistent with this Opinion. An appropriate Order will issue.